E-FILED
Thursday, 14 March, 2019  03:12:49 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cr-30059 |
| | ) | |
| SYED F. AHMAD and | ) | |
| MUHAMMAD USAMA, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENTATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Defendants Syed F. Ahmad and Muhammad Usama's Joint Motion and Memorandum of Law in Support of Defendants' Motion to Suppress (d/e 19) (Motion).   For the reasons set forth below, The Motion should be DENIED.

## BACKGROUND

On November 6, 2018, the Grand Jury issued an Indictment (d/e 1) (Indictment) charging Defendants with possession of 100 kilograms or more of a mixture or substance containing marijuana, with intent to distribute, in violation of 18 U.S.C. § 841(b)(1)(B) and 18 U.S.C. § 2.  On December 31, 2017, Morgan County, Illinois, Deputy Sheriff Derek Suttles arrested Defendants when Deputy Suttles found a large amount of

marijuana in a recreational vehicle (RV) in which Defendants were travelling.  Defendants were initially charged in the Circuit Court for Morgan County, Illinois.  People v. Ahmad and Usama, Case Nos. 2018-CF-1 and 2018-CF-2 (State Court Proceedings).  Defendants filed motions to suppress the evidence in the State Court Proceedings.  On July 12, 2018, the Morgan County Circuit Court held an evidentiary hearing (Hearing) on the state court motions to suppress.  Defendants attached a transcript (Transcript) of the Hearing to the Motion before this Court.  Motion, attached Transcript.  The Morgan County Court denied the state court motions to suppress.  State Court Proceedings, Amended Order entered September 20, 2018 (d/e 23).[1]

The federal Grand Jury issued the Indictment on November 6, 2018. On December 14, 2018, Defendants were arrested and arraigned. Executed Arrest Warrants (d/e 11 and 12); Minute entry of proceedings on December 14, 2018.  Defendants then filed the Motion before this Court. Both Defendants and the Government waived having a second evidentiary hearing before this Court.  Both Defendants rely on the Transcript to support the Motion.  Minute Entry of proceedings on February 12, 2019;

---

[1] The Government does not assert that the State Court's decision has any preclusive effect in this case.

Status Report of Muhammad Usama entered February 15, 2019 (d/e 25).

The parties have now completed briefing the Motion.

STATEMENT OF FACTS

Deputy Suttles was the only witness at the Hearing.  Suttles testified that on December 31, 2017, he was conducting drug interdiction while patrolling on Interstate 72 (I-72) near Jacksonville, Illinois.  Deputy Suttles was in uniform and was driving a marked squad car.  Suttles was parked in a turnaround between the eastbound and westbound lanes of I-72 near mile marker 64.  At approximately 9:54 a.m., Suttles observed an RV pass him traveling eastbound.  Suttles could not read the license plate because the plate was dirty.  Suttles stated that I-72 had dirty traffic conditions due to recent snow and sleet in the area.  Suttles pulled onto the eastbound lanes to follow the RV to try to read the license plate.  Suttles had not observed the RV violate any traffic law before he pulled out.  Transcript, at 12-14.

Suttles observed the RV exit onto the U.S. Route 267 (US 267) exit ramp at mile marker 64.  The exit was short distance from the turnaround where Suttles had parked.  Transcript, at 15.  The turn signal of the RV came on after the vehicle had entered the exit ramp.  According to Suttles, failing to activate the turn signal 200 feet before entering the exit ramp was

a traffic violation.  Transcript, 49-50.  The RV turned left onto US 267 and drove to the Love's Truck Stop (Truck Stop) located immediately north of the intersection of I-72 and US 267.  The RV pulled up to a gas pump. Suttles parked in a parking place next to the convenience store (Store) at the Truck Stop.  One of the Defendants got out of the RV and pumped gas into the RV.  Suttles went into the Store to use the bathroom.  Suttles may have also purchased a drink.  While in the Store, Suttles saw the Defendants enter the Store.  Suttles did not recall talking to either Defendant in the Store.  Suttles spent no more than five minutes in the Store.  Suttles exited the Store and drove his squad car across the parking lot and parked next to the IHOP restaurant located on that same parking lot as the Truck Stop.  The Defendants remained in the Store.  Transcript, 15-17, 22-23.

While in the squad car, Deputy Suttles ran the license plate information from the RV.  The RV had Idaho plates.  The registration information included the owners' driver's license numbers.  Suttles checked the driver's license numbers.  The numbers were assigned to a white couple; one was born in 1941 and the other was born in 1943.  The registration information did not give the name of the owners.  The Defendants did not match the physical characteristics of the registered

owners of the RV.  A Store employee also approached Deputy Suttles in his squad car.  The Store employee told Deputy Suttles that the Defendants were acting suspiciously.  The Store employee told Deputy Suttles that the men did not want to leave the Store while Deputy Suttles was outside in the parking lot.  Transcript, 18-19, 51, 55.[2]

The Defendants, however, left the Store shortly thereafter.  Deputy Suttles waved at the Defendants and asked them to come over to his car.  Deputy Suttles also drove and parked his squad car next to and parallel to the RV on the driver's side of the RV so that the passenger door of the squad car was even with the driver's door of the RV.   Ahmad came over to the squad car and stood by the driver's window.  Deputy Suttles was seated in the driver's seat.  Usama went back into the passenger door of the RV.  Transcript, 20-22.

Deputy Suttles told Ahmad that he was working drug interdiction on I-72.  Deputy Suttles told Ahmad that he was free to leave at any time and he wanted to ask Ahmad some questions about his trip.  Deputy Suttles had a hunch that something was wrong with the Defendants at this point.  Transcript, 23-24.  Ahmad told Deputy Suttles that he was traveling with his

---

[2] Deputy Suttles may have run the license plate information before he moved the squad car.  He testified that he ran the license plate before he spoke to Ahmad.  Transcript, at 55.

two children and his cousin, Defendant Usama, from Houston, Texas, to Columbus, Ohio, to visit relatives for the holidays. Deputy Suttles told Ahmad that he noticed the RV had Idaho plates. Ahmad told Deputy Suttles that the four of them flew from Houston to Idaho, rented the RV there, and then started driving to Ohio. Ahmad told Deputy Suttles that they flew to Idaho because it was cheaper to rent RVs there. Transcript, 25-26. Deputy Suttles and Ahmad were both calm and both spoke in a normal conversational tone throughout their encounter at the Truck Stop. Transcript, 27-29, 53-54.

By this time, Deputy Suttles' suspicions about the Defendants had grown to more than just a hunch. Deputy Suttles thought the story about flying to Idaho to get the RV was implausible. Deputy Suttles began a drug investigation of the Defendants. Deputy Suttles asked Ahmad to let him see the rental agreement and Ahmad's driver's license. Ahmad went back to the RV to get the rental agreement. While he was getting the agreement, Deputy Suttles contacted Illinois State Trooper Eli Adams to see if he was close enough to bring his drug-sniffing dog to the Truck Stop to perform a free-air sniff around the RV for drugs. Transcript, 26, 55.

Ahmad returned with the rental agreement and his driver's license. The agreement was in Ahmad's name. Deputy Suttles ran Ahmad's

license information to see if Ahmad had any warrants out against him in other states.  Deputy Suttles continued talking to Ahmad while he checked the information.  The information check did not turn up any outstanding warrants.  Deputy Suttles asked Ahmad for consent to search the RV. Ahmad consented to a search of the RV and anything inside of it.  Deputy Suttles then asked Ahmad if he could ask Usama to come out of the RV. Ahmad went back to the RV and got Usama.  Transcript, 27-29, 70.

Deputy Suttles still had the rental agreement in his possession. Deputy Suttles was not sure if he still had Ahmad's driver's license.  Deputy Suttles testified that he would have returned the rental agreement and license (if he still had the license) if Ahmad had asked for them.  Ahmad did not ask Suttles to return the license or rental agreement during the encounter.  Transcript, 27-28, 43, 56-57.

Usama walked up to the squad car.  Deputy Suttles also told Usama he was free to go.  Deputy Suttles testified that he noticed that Usama was cold standing outside next to the squad car.  Usama was wearing only lightweight clothing.  Deputy Suttles estimated that the temperature was below five degrees at that time.  Deputy Suttles asked Usama if he would be more comfortable sitting in the squad car while they spoke.  Usama agreed to sit in the squad car during their conversation.  Usama got into the

back of the squad car and shut the door. Deputy Suttles asked Usama the same questions he asked Ahmad about their trip. Usama's answers were consistent with Ahmad. Usama also said that they flew from Texas to Idaho, rented the RV, and started driving to Ohio. Transcript, 29-30.

While Suttles was talking to Usama, Trooper Adams arrived with his drug sniffing dog name Kilo. Adams arrived approximately 15 minutes after Deputy Suttles first started talking to Ahmad. Deputy Suttles got out of the squad car and talked with Adams. Suttles and Adams asked Ahmad for permission to conduct a free air sniff with Kilo around the RV. Ahmad agreed. Kilo alerted on the RV. The time between Adams arrival at the Truck Stop and Kilo's alert was no more than two minutes. Transcript, 31-33, 35, 45.

During this part of the encounter, Usama remained in the back seat of the squad car. He could not have gotten out without assistance. The rear doors of the squad car could not be opened from the inside, similar to car doors with engaged child-safety locks. Usama did not ask to get out of the car during this time. Deputy Suttles said Usama was free to exit the squad car, but he never asked to be let out of the squad car. Transcript, 58-59.

Deputy Suttles' conversations with the Defendants were in a conversational and friendly tone. The Defendants were cooperative and

Deputy Suttles did not raise his voice during the conversations with the Defendants.  Transcript, 53-54.

Deputy Suttles testified that Ahmad and Usama were free to leave at any time prior to the alert by Kilo.  Deputy Suttles testified that after Kilo alerted on the RV, Ahmad and Usama were no longer free to leave. Adams and Suttles searched the RV and found large amounts of marijuana.  Ahmad and Usama were arrested and taken into custody. Deputy Suttles wrote Defendant Ahmad a citation for cannabis trafficking. Usama made incriminating statements to law enforcement officers after his arrest.  Transcript, 48-49, 58, 60.

The record does not contain an audio or video recording of the incident.  Deputy Suttles' squad car had a video camera, but the camera did not come on because Suttles did not turn on his lights and sirens.  The Truck Stop had video cameras recording events in the Store, but not outside.  See Transcript, 61-63.

ANALYSIS

Ahmad and Usama move to suppress the evidence found in the search of the RV and Usama's subsequent incriminating statements. Defendants argue that Deputy Suttles unlawfully detained them without reasonable suspicion of any criminal activity in violation of their Fourth

Amendment rights to be free from unreasonable searches and seizures.
Defendants argue that the evidence secured by the subsequent search of
the RV and interrogation of Usama resulted from the illegal detention and
must be suppressed.  The Government argues that Deputy Suttles did not
detain Ahmad or Usama until after Kilo alerted on the RV.  The
Government also argues that Ahmad and Usama were always free to go
prior to that point.  The Government additionally asserts that Ahmad
consented to the search of the RV.  In the alternative, the Government
argues that Suttles had reasonable suspicion that criminal activity was
afoot and had a proper basis for a brief investigative stop until Kilo alerted
on the vehicle.  Under any of the Government's theories, the discovery of
the cannabis, the subsequent arrests, and Usama's subsequent
incriminating statements, were all proper results of legal conduct.

A police officer may speak to an individual without implicating Fourth
Amendment rights against unreasonable searches and seizures. United
States v. Drayton, 536 U.S. 194, 201 (2002); United States v. Shields, 789
F.3d 733, 743 (7th Cir. 2015).  A seizure does not occur merely because a
police officer approaches an individual and asks questions.  Florida v.
Royer, 460 U.S. 491, 497 (1983); United States v. Smith, 794 F.3d 681,
684 (7th Cir. 2015); United States v. Childs, 277 F.3d 947, 950 (7th Cir.

2002). If a reasonable person would feel free to disregard the police and go
about his or her business, the encounter is consensual and not a seizure.
Smith, 794 F.3d at 684.  A seizure only occurs when police conduct
communicates to a reasonable person that he or she is not at liberty to
ignore the police presence and leave. Id.

Several factors are relevant to determining whether a reasonable
person would believe that he or she was free to leave or whether the
encounter amounted to a seizure:

> (1) whether the encounter occurred in a public place; (2)
> whether the suspect consented to speak with the officers; (3)
> whether the officers informed the individual that he was not
> under arrest and was free to leave; (4) whether the individuals
> were moved to another area; (5) whether there was a
> threatening presence of several officers and display of weapons
> or physical force; (6) whether the officers deprived the
> defendant of documents he needed to continue on his way; and
> (7) whether the officers' tone of voice was such that their
> requests would likely be obeyed.

Shields, 789 F.3d at 743.

These factors weigh heavily in favor of finding that Deputy Suttles'
encounter with Ahmad was consensual at least up until Ahmad consented
to the search of the RV the first time.  The encounter occurred in a public
place, the parking lot of the Tuck Stop.  Suttles asked Ahmad to speak with
him but told Ahmad up front that he was free to go.  Ahmad thereafter
consented to speak to Suttles.  Suttles did not move Ahmad to a different

area.  Suttles made no threatening display of weapons or physical force, and Suttles spoke in a calm tone of voice, not a commanding voice that required obedience.

Suttles asked to see the rental agreement for the RV, and possibly Ahmad's driver's license.  An officer may ask to see identification and may run a check of that identification without turning a consensual conversation into a detention.  See e.g., United States v. Soto-Lopez, 995 F.2d 694, 698 (7th Cir. 1993).  The reasonable person, however, could understand that he was detained if the officer refused to return the documents.  United States v. Tyler, 512 F.3d 405, 410 (7th Cir. 2008).

In this case, very little time passed from the moment that Ahmad handed the rental agreement to Deputy Suttles until he consented to the search.  Suttles interacted with Ahmad and Usama for a total of approximately 15 minutes before Officer Adams arrived with Kilo.  During that 15 minutes:

- Suttles spoke to Ahmad and inquired about his trip;

- Suttles asked Ahmad for the rental agreement and his driver's license;

- Ahmad retrieved the rental agreement from the RV;

- Suttles contacted Adams to ask him to come to the scene;

- Ahmad returned to the squad car with the rental agreement;

- Ahmad gave the rental agreement and license to Suttles;

- Suttles ran a check on the information for outstanding warrants;

- The check came back negative;

- Suttles asked Ahmad for consent to search and Ahmad gave consent;

- Suttles asked to speak to Usama;

- Ahmad got Usama from the RV;

- Usama started to speak to Suttles;

- Suttles indicated it was a very cold day and Usama appeared to be cold;

- Suttles, due to the extreme cold, offered to let Usama sit inside the squad car while they talked;

- Usama accepted the offer and got into the squad car; and

- Suttles spoke to Usama in the squad car.

Given that all these actions occurred in 15 minutes, it is clear that very little time passed from the time that Suttles completed the check for warrants to the next event in the sequence in which Suttles asked for and received Ahmad's consent to the search the RV.  The Court finds that a reasonable person would not have perceived that Suttles intended to continue to retain

the rental agreement and driver's license due to the brief period of time
which elapsed between the time that Suttles completed the check for
warrants and Ahmad gave consent.  Under these circumstances, a
reasonable person would have perceived that he was free to go.  Applying
all the <u>Shields</u> factors and looking at the facts as a whole, the Court finds
that a reasonable person would have understood that he was free to go at
least up until Ahmad consented to the search of the RV.  The subsequent
search of the RV was valid once Ahmad gave valid consent.  <u>Schneckloth
v. Bustamonte</u>, 412 U.S. 218, 219 (1973); <u>see</u> <u>e.g.</u>, <u>United States v. Muriel</u>,
418 F.3d 720, 725 (7th Cir. 2005).[3]  Because the consent was valid, the
free-air sniff by Kilo was valid and the subsequent search was valid.
Suttles did not violate the rights of Ahmad or Usama.

Ahmad and Usama argue that the encounter became a detention
when Suttles took Ahmad's driver's license and the rental agreement, or no
later than when Suttles did not return the documents immediately after
checking for outstanding warrants.  Ahmad and Usama rely on <u>United</u>

---

[3] The Defendants do not argue that Ahmad's consent was involuntary.  The issue of whether the consent
was voluntary, therefore, is forfeited.  <u>See</u> <u>United States v. Olano</u>, 507 U.S. 725, 731 (1993) ("'No
procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other
sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right
before a tribunal having jurisdiction to determine it.'") (quoting <u>Yakus v. United States</u>, 321 U.S. 414, 444
(1944). <u>United States v. Olano</u>, 507 U.S. 725, 731, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508 (1993)
.

States v. Tyler, 512 F.3d 405, 410 (7th Cir. 2008) and United States v. Cantero, 551 F.Supp. 397 (N.D. Ill. 1982) to support this argument.

The circumstance is substantially different from the events underlying either Tyler or Cantero. In Tyler, the officers stopped defendant Tyler while walking on a public sidewalk carrying an open, partially filled beer bottle. The officers told Tyler he was violating a city ordinance by carrying the open bottle containing alcohol and asked for his identification.[4] The fact that the officers accused Tyler of violating the law was a key factor in determining that Tyler was detained in this incident. See Tyler, 512 F.3d at 410. Here, Deputy Suttles did not accuse Ahmad of committing a violation of law when he began the encounter. Suttles told Ahmad he was free to go. Defendants argue that Suttles told Ahmad he was investigating Ahmad for drug trafficking. That is incorrect. Suttles told Ahmad he was on drug interdiction patrol. Suttles did not say that he was investigating Ahmad. Suttles told Ahmad that he was free to go. As such, the situation was not comparable to the situation in Tyler.

In Cantero, the officers talked to the defendant Cantero in O'Hare Airport immediately after Cantero arrived from Miami, Florida, and had

---

[4] The officers were incorrect in their belief that walking on a public sidewalk with an open bottle of beer violated a city ordinance. Tyler, 512 F.3d at 408.

picked up his luggage at the baggage retrieval rack. The officers asked for and received Cantero's driver's license and airplane ticket. After looking at the documents, the officers returned the documents and asked for permission to search his luggage. Cantero refused consent to search the luggage. The officers opened the luggage without valid consent. The officers asked for consent to inspect a "Prince of Denmark" cookie canister that was sealed with tape that was inside the luggage. Cantero again refused to consent to the search. Over Cantero's objections, the officers took the luggage to the international terminal to have a drug-sniffing dog conduct a free-air sniff around the luggage and the canister. After the dog alerted, the officers opened the canister and found cocaine. Cantero, 551 F.Supp. at 400. The encounter in Cantero clearly was not consensual. Cantero refused consent to search and the officers searched anyway. The officers took Cantero's luggage to a different location over his objections. Nothing like this happened in this case. Ahmad consented to the search. Cantero and Tyler do not apply.

Defendants further argue that even if the detention did not occur when Suttles kept the rental agreement, the detention clearly occurred when Usama was locked in the back of the squad car. The Court again disagrees. Ahmad had already consented to the search. No evidence

indicates that the subsequent questioning of Usama somehow vitiated the validity of Ahmad's consent and Defendants cite no authority to support such a proposition.

In addition, Usama voluntarily entered the squad car to get out of the cold. Suttles did not order him into the car. Suttles also told Usama he was free to leave. Suttles only offered entry into the squad car to get out of the cold. Suttles got out of the squad car when Adams arrived, but only left Usama in the car for no more than two minutes before Kilo alerted. Usama did not indicate that he wanted back out into the cold during that minute or two. Under all the circumstances, the Court finds that the encounter was consensual, and Usama did not object to Ahmad's consent or otherwise withdraw or vitiate that consent.

Moreover, Suttles had reasonable suspicion to detain the Defendants before Ahmad gave Suttles the rental agreement, and so, before Ahmad claims the detention occurred. An officer may detain a person to conduct an investigative stop if the officer has "reasonable suspicion based on articulable facts that something was amiss." United States v. Thomas, 87 F.3d 909, 911 (7th Cir. 1996). Reasonable articulable suspicion is "something less than probable cause but more than a hunch." United States v. Baskin, 401 F.3d 788, 791 (7th Cir. 2005):

3:18-cr-30059-SEM-KLM    # 30    Filed: 03/14/19    Page 18 of 20

Reasonable suspicion is not an onerous standard: Reasonable suspicion requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause to effect an arrest. United States v. Esquivel– Rios, 725 F.3d 1231, 1236 (10th Cir. 2013). "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity." Id. (quoting Poolaw v. Marcantel, 565 F.3d 721, 736 (10th Cir. 2009)). Indeed, we have held that factors consistent with innocent travel may contribute to reasonable suspicion. United States v. Valles, 292 F.3d 678, 680 (10th Cir. 2002). As long as an officer has "a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004).

United States v. Petit, 785 F.3d 1374, 1379-80 (10th Cir. 2015) (emphasis in the original) (cited with approval in United States v. Sanford, 806 F.3d 954, 959 (7th Cir. 2015)).

In light of these principles, Suttles had more than enough information to have reasonable suspicion that Ahmad and Usama were engaging in criminal activity before Suttles had possession of the rental agreement, and possibly, Ahmad's driver's license. Ahmad committed a minor traffic violation when he did not signal properly before exiting I-72; the RV was registered in Idaho to a white couple in their 70s, and the Defendants did not fit that physical description; a Store employee told Suttles that the Defendants were acting suspiciously in the Store and that they seemed to be waiting for Suttles to leave before exiting the Store; Ahmad told Suttles

Page **18** of 20

that he rented the RV, but the RV was registered to two individuals, not a company that rented vehicles; and Ahmad told a completely implausible story that he and Usama were travelling from Houston, Texas, to Columbus, Ohio, but chose to fly with Ahmad's two children from Houston, Texas to somewhere in Idaho to rent the RV and to drive from Idaho to Ohio, instead of just renting an RV in Houston and driving directly to Columbus, because RVs were so much cheaper to rent in Idaho.  The story was clearly implausible, if not preposterous.  After Ahmad told this story, Suttles knew more than enough articulable facts to have reasonable suspicion that "something was amiss" and to detain the Defendants. Thomas, 87 F.3d at 911.  Suttles confirmed that he had begun a drug investigation of the Defendants by that time.  Shortly thereafter, Ahmad voluntarily consented to the search.  Thus, even if Suttles detained Ahmad and Usama after he had the rental agreement, the detention was valid for the brief time before Ahmad consented to the search.  Thereafter, Suttles had valid consent to search.  Therefore, the search was valid.  Suttles did not violate the Defendants' rights.

THEREFORE, THIS COURT RECOMMENDS that Defendants' Joint Motion and Memorandum of Law in Support of Defendants' Motion to Suppress (d/e 19) should be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   March 14, 2019

_s/ Tom Schanzle-Haskins_
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE